Thank you. May it please the Court. This appeal requires us in some ways to travel back in time to a time as difficult as it may be to imagine before we had the COVID-19 pandemic. To a time before the COVID-19 pandemic, when the plaintiffs in this case purchased ski pass insurance from the defendants to cover the loss of their ski pass in the event that the plaintiff was quarantined. Back then, no one was contemplating a worldwide pandemic. No one was contemplating the closure of ski resorts to prevent the spread of coronavirus. And no one was contemplating the stay-at-home orders that during the 2020 ski season confined and restricted the movement of people to prevent the spread of a disease. The question before this Court today is not whether the stay-at-home or the closure orders were quarantines as the CDC came to define that term and as we all came to understand it during the course of the pandemic. The question before the Court is whether a reasonable person purchasing this ski insurance would have understood that restrictions imposed upon them by the government restricting their activities and their movements to prevent the spread of a disease was in fact a quarantine as a reasonable person would understand that phrase. Counsel, what authority stands for that as the standard as opposed to defining what a quarantine is and applying a reasonable definition of it in the context of the contract? Thank you, Judge. So the standard, the basic standard of contract interpretation and in specific policy interpretation is that you look at the policy terms from the perspective of a reasonable lay, ordinary lay person purchasing insurance. And that's the Meijer versus Jewelry case from the Missouri Supreme Court as well as the Genvira or as the Vote versus State Farm case from this Court. That is the policy standard by which we view the terms in the policy because technical terms, and this is decided in our brief, technical terms, phrases are not getting a technical meaning unless that meaning is specific. But a dictionary definition is not necessarily a technical term. I mean, you would think the ordinary person would also anticipate perhaps the necessity of reading a dictionary to understand what terms. I absolutely agree. And our claim here depends upon dictionary definitions. We cite in the brief on pages 20 and 21, we cite five different dictionary definitions, all of which consistently define a quarantine as a restriction on the activities or the travel of a person to prevent the spread of a disease. Now, ARCH relies on a narrower definition of quarantine that requires isolation. But when you have a broad definition and you have a narrow definition in the dictionary and the insurance company elects not to include a definition for that term in the policy, the ordinary person is entitled to rely upon the broad definition in the dictionary that favors coverage. That follows from the basic contract policy interpretation principle that if there are two reasonable meanings, even if one is more reasonable or better, if there are two reasonable meanings of policy terms, the one that favors the insured and that favors coverage controls. This Court applied that principle under Missouri law in Vote versus State Farm. Southern District of New York seemed to find consistent with, or at least our case here is consistent with the interpretation of the meaning of quarantine. What case has been decided interpreting contracts like this involving a definition of the term quarantine that's consistent with the definition of it that you argue for? So the doubting case out of Illinois held on a motion to dismiss that someone who was ill and someone who was quarantined qualified for ski pass or for travel insurance under both the quarantine provision and also under the illness provision of that policy. And those were alternative holdings. But I'm glad you brought up the New York decision, which I think is the in re generale decision that was cited by Arch. Because what's specific about that policy is that the insurance company defined the term quarantine. And it defined the term quarantine in relation to isolation. Arch chose not to define the term. And by not defining the term, Arch is necessarily telling the policyholder that they can rely on a reasonable dictionary definition here. Counsel, even if we agree with you, why doesn't the travel supplier exclusion apply to preclude coverage here? So we cite three independent reasons why the travel supplier exclusion does not apply in this instance in our brief. Let me focus on one of them. And that is the concurrent proximate cause doctrine under policy interpretation. What this court's precedent and what the Missouri cases we cite in our brief stand for is that if you have two causes of a loss, you have one cause that causes the loss and then you have another cause that contributes or could also cause the loss during the same period of time. And one's covered and the other one is not covered. Unless the policy specifically says otherwise, the coverage cause controls over an excluded cause. That is the Allstate case I think is this court's articulation of that standard. Here, the stay-at-home orders, which restricted the ability of the plaintiffs to use their ski pass, the stay-at-home orders were an independent cause. So even if you were to agree with Arch that the closure of the ski resorts was a failure to supply travel services under the policy, it wouldn't have mattered whether the ski resorts were open or closed because the people still couldn't have traveled to use them. They were quarantined by the stay-at-home orders and the stay-at-home orders were independent of the orders closing the resorts. But does it matter that the resorts closed before the general orders to stay at home went into effect? I don't think that matters because first of all, when the resort orders closed, we didn't know how long they were going to be closed for. It ultimately turned out they were closed for the rest of the ski season. But in any event, it doesn't matter when it occurs. If they're concurrent causes and one's covered and one's excluded, the covered cause is supposed to control unless Arch has contracted around that default contract rule. And Arch did not do that. I have a question about the stay-at-home orders. There's talk about just general stay-at-home orders. My first question is, are any of the specific stay-at-home orders in the record so we can see exactly what those restrictions are? Because it seems to me that when we say stay-at-home orders, that could be a number of things. And if a stay-at-home order was a strong recommendation by a particular community to stay at home, but nothing prevented one of your clients from getting in the car and driving to the ski slope, that might not be an independent cause, would it? Well, I think that, first of all, I don't, to be honest, Your Honor, that's a good question. I don't think that all of the orders are in the record. But I do know that what we alleged, and this is obviously on a motion to dismiss, what we alleged was, quote, that the stay-at-home orders prevented the plaintiffs from traveling, prevented them from entering the resort, that the policyholder could not travel to or use the resorts because of the orders. And that's on page 81 of the appendix. And I know we quoted some California stay-at-home order specifically at that page, identifying that the stay-at-home orders were preventing them from doing this. But I would also say that even if they were, you know, I think that no one has suggested that a quarantine must be an order enforceable by some type of criminal penalty. A quarantine could be a directive or a recommendation from the government saying you need to stay at home to prevent the spread of a disease. And if it does that, and if it is a quarantine, then it remains a covered cause of the loss, regardless of whether the resort remained open or was closed. Counsel, doesn't the language of the policy indicate that it is necessary for it to be mandatory? It says you being quarantined, and I think there's also a you cancel phrase. Yeah. So let me address the you being quarantined phrase. I would submit that the district court and ARCH put far too much, they asked that phrase to do far too much work. You being quarantined means that, and if you look at the policy itself, there are various coverage provisions here. Some of them apply to you and your travel companion or your spouse or your family members. This one applies to you. So what it is effectively telling, the only thing that's telling the policyholder is that the quarantine has to apply to you and not simply to someone you're traveling with or a family member. That's not going to get you coverage. What it means is that you are the one that has to be quarantined. It's no different than me saying you can vote if you are a Missourian. There's no specific order that says I can vote. I fall into the class of people who are entitled to vote. So I think then that takes me back to the ordinary meaning of quarantine. And I guess convince me that the ordinary meaning of quarantine can include a voluntary quarantine rather than having to be quarantined. Well, I would submit in this case, I think the allegation plausibly inferred in our favor at this stage is a mandatory quarantine. But even if we were talking about a voluntary quarantine, it is, quote, a restriction on the activities of a person designed to prevent the spread of a disease. Or as one definition cited in our brief says, a general period of time in which people are not allowed to leave their homes or travel freely. And these restrictions on movement, they have been restricted. I mean, these stay-at-home orders told people to stay at home and to avoid going out and doing unnecessary things to prevent the spread of the disease. Now, the magnitude of the quarantine, whether you had to be put into a bubble or stay at your home or you could leave to go do your essential activities, that's a magnitude issue. It doesn't define quarantine to mean you have to be put into a bubble. And if ARCH had wanted to define it that way, they could have put that into the policy. And I would defer the court to your opinion, Judge Gross, in the Bauer v. AGA case. Very similar policy to this one, travel insurance policy. And in that case, there was an epidemic exclusion. And the plaintiff argued there was a broad meaning of epidemic and a narrow meaning of epidemic. And the court said, well, there's a broad meaning. That means the insurance company intended it to be broadly construed. Here, we have a broad meaning of quarantine and a very narrow meaning that ARCH wants to impose upon us. And the case law says that when you're talking about coverage, you're supposed to construe things for coverage broadly. And exclusions are supposed to be construed narrowly. So, if we're going to... Judge, you're within your battle time. You can continue if you like. Let me just wrap up if I can, Your Honor. If we're going to construe exclusions to say a broad meaning when it's not defined controls, I think we should also construe coverage provisions the same way. I would like to reserve the rest of my time. Thank you. Thank you. Thank you. Mr. Swanholt. Good morning. Thank you, Your Honors. May it please the court. I'm Eric Swanholt, and I'm here on behalf of ARCH Insurance Company, an out-of-town LLC. Counsel, also, if you could... Sorry. The podium can raise. There's a little button to your right there. You can... Thank you. All right. I'll lean in. Is that better? Yes.   I'm Eric Swanholt, and I'm here on behalf of ARCH Insurance Company, an out-of-town LLC doing business as Red Sky Travel Insurance. May it please the court. Before I begin with my prepared remarks, I'll respond to Judge Kelly's question about whether or not the stay-at-home orders are in the record. Some of them are. We cite them in our brief at page 5 and 6. And specifically to your question, we cite in our footnote 4 what the California State Government wrote with respect to what the stay-at-home orders mean. They did not require all Californians to remain isolated at home. Instead, it said, there are a wide range of circumstances in which you may leave your home. You may leave your home to go to work at any business or other entity that is allowed to open. You're allowed to leave your home to engage in in-person worship and protest activities consistent with public health directives. You're allowed to patronize local businesses or to care for friends or family who require assistance. You may also leave your home without a specific destination in mind. You may go for a walk, engage in physical recreation. And indeed, some other orders that we have on the record permit outdoor exercise, outside recreational activities, and even hiking to the top of a mountain peak and skiing or snowboarding down. Counsel, was the motion to dismiss converted to a motion for summary judgment, or do we have to look to the pleading rather than the documents? From my recollection, Your Honor, it was not converted to a motion for summary judgment, so it is a motion to dismiss. That's how it was granted. Counsel, while it's fresh, would you address the concern for the narrowness and breadth of the term quarantine? And if it is a dichotomy between those two, why wouldn't the appellants receive the benefit of a broader definition? Sure, Your Honor. And this Court has addressed that issue, and so did Judge Wimes. When interpreting contracts like this one, insurance policies included, the Court looks to the plain meaning of the language. First, it does not get into narrow or broad or defining terms in favor of an insured and against an insurer, unless the Court concludes that the term is ambiguous. Here, there's been no such conclusion. In fact, all of the courts that have looked at that issue have concluded that in the context of the policy, the term quarantine is not ambiguous. It can only actually mean what Judge Wimes and the others have concluded, that it means an individual insured's isolation. Well, Counsel, let me ask you about that. I agree that the policy has an individualized requirement, but if an insured is personally subject to a stay-at-home order or quarantine, isn't it individualized as to them from their perspective? So, in the terms of how quarantine has been defined by the CDC and others, it has talked about… Well, we're not looking at the CDC. We're looking at the ordinary meaning. The CDC has, I think, tracked the ordinary meaning, and the dictionary as well. If we look across all of the meanings, they almost always connote that sense of individual isolation. So, it's not just a limitation on being able to go to a ski resort. It's being isolated in your room, away from others. In fact, the CDC says that if you have COVID, for example, you need to isolate in your room. Stay away from family members and others, right? So, if a town was under orders for the people of the town not to leave the city limits in order to prevent the spread of a disease, are they under quarantine? So, under the policy that we're talking about with CDC, etc., the answer would be no, because they could still leave their home. They could still go to the store. They could worship. They could exercise. They're not isolated individually. They are, as a town, limited in their travel, but not quarantine. So, as the Court knows, we're here because Judge Wimes granted Arch's motion to dismiss and found that the insurance policy in question is not ambiguous. It found that the insured being quarantined is not reasonably susceptible to more than one meaning. And it also found, as you indicated, Judge, that the travel exclusion applied. And therefore, plaintiff's complaint failed the state of cause of action and should be dismissed. What about multiple concurrent causes? So, if we agree that Mr. Rossi was quarantined, does the travel supplier exclusion matter? If you agree that Mr. Rossi was quarantined under the policy, then we would argue still that, at the moment, the ski resorts were closed by the Altera statement, closing those ski resorts. The travel supplier failed to provide travel services, and the exclusion applied. But this is a season pass. Wouldn't that only apply to that period of time prior to the stay-at-home order? It would apply – well, the resort was closed, and there was no end time put on the closure by Altera, right? It was closed indefinitely until – But my question is, if, for example, there was a travel supplier exclusion, the resort closed for a period of time prior to the stay-at-home order being put in place, I think you could argue that, well, for that period of time, the travel supplier exclusion would apply. But what about the rest of the season? It's a season pass. The alleged damages are for the whole use of the season pass. Right. So a couple of points on that. First of all, of course, this happened in mid-March, so there wasn't much of a season left. Second, we would argue that the failure of the travel supplier to provide services is the exclusion and would bar coverage. Third, there is no coverage for COVID, right? And so unless you found – and I'm going to go with your question as you phrased it, which is if you found that Mr. Rossi himself was individually quarantined, then you might have a concurrent cause situation. But, again, our argument is that because COVID is the cause, right? COVID is the cause of the orders and the cause of the closure. There's no coverage for closure for COVID. You don't have a coverage issue to begin with, and the lack of an exclusion doesn't create coverage. So let me go back to the posture of the case. Since this is a motion to dismiss and we have to look at what was plausibly alleged, is this a case where Mr. Rossi should lose on summary judgment but be allowed to proceed with his case until then? So Judge Williams did consider that issue. That's why he granted the motion with prejudice, right? Because he concluded that there's no need for further factual or legal development because the question at issue is a question of law, right? And the question of law is whether or not this contract is ambiguous, whether or not the term quarantine is used in context. But did he not allege that he was under quarantine? He did not allege that he was under quarantine, no. Mr. Rossi, none of the plaintiffs in this case allege that they ever contracted COVID, were instructed by a doctor to remain isolated, and they did not allege. Quarantine as for the ordinary meaning of the term. They allege that the policy was vague as to that term. But the question of whether or not a policy is vague or ambiguous is a question of law. And they decided in a motion to dismiss. It does not need factual development. And that's what Judge Williams concluded, and that's what the case law has supported. So here, as we've discussed, the plaintiff invites, invited Judge Williams, and now invites this Court to answer the question of whether or not the term quarantine is ambiguous in this policy. And they start that invitation with a misstatement of the law, which is that in insurance policies, any undefined term must be construed in favor of coverage. And given its broadest reasonable meaning, that's not the law. The law is, as we know from this Eighth Circuit, that insurance contracts are interpreted like all contracts and subject to general contract interpretation principles. Right? That's Johnson v. Safeco and Brazil v. Auto Owners. We know that if an insurance contract is clear and unambiguous, the Court does not have the power to rewrite the contract. The Court must accept the written policy as an expression of the agreement between the parties. That's TNT speed. And that a policy's terms must be read in the context of the surrounding terms and the provisions at issue. That's United Fire, all Eighth Circuit cases. Thus, under Missouri law, an unambiguous policy must be given its plain meaning. And this is done without the policy being construed in favor of the insured or against the insurer. That only occurs when the Court finds that the provision at issue is ambiguous. That's under Bar Plan. As we know, an ambiguity is not created simply because the parties disagree under the meaning of a term. That's from Safeco. Or because a term is not defined in the policy. That's also from Safeco. Or because a term has multiple definitions in the dictionary. That's from Brazil. Taken all together, Judge Wimes found, just like every court who's actually made a determination of what these terms mean, has found that the policy is not ambiguous. That the insured being quarantined is an individualized event, like being hijacked or required to serve on a jury or under a subpoena. And that because no plaintiff in this case alleged that they were ever individually quarantined for any reason, let alone COVID, there's no coverage. What's your response to the Dowding case? Dowding didn't evaluate. If you read the case, it did not sit down and go through what the meaning of quarantine is. Dowding simply concluded that there was, the plaintiff there had COVID, had a claim that she had contracted COVID, and so found coverage under that policy, under that provision. Did not sit down and do the evaluation that the other cases that we've cited have done, where they ultimately conclude that the term is not ambiguous. Counsel, I'm still having trouble understanding your position that the word,  being under some sort of order to cease your movement to prevent the spread of the disease. Right, and I think if I said that, I misspoke. What I meant is, and what I should have said was, that quarantine requires isolation. Not that you have actually contracted COVID. So you can be isolated because you're exposed to COVID. But you may never contract it. Isolation in what context? Isolation in the individual context. Right, and so it is possible that a cruise ship, for example, can be quarantined. Right, so it's not to say that if it's more than one person, it's automatically a very broad general definition. A cruise ship can be quarantined because members of the crew or the shipmates or the folks on board were exposed. During the Spanish flu epidemic 100 years ago, there was a town high in the mountains of Colorado where they put up a roadblock and didn't allow the citizens to leave. And you're telling me they were not quarantined? Well, in this definition, you know, I have to look at that level more closely, Your Honor. But they probably were quarantined in a context of they couldn't leave the town. But they weren't quarantined in the context of this contract and in the way the courts have interpreted this language, right, in terms of that individual isolation. So, and the CDC, you know, I mean, it's interesting. Even, you brought that up. I actually have a quote from FDR in 1937, so not long after that timeframe, where he wrote, Quarantines mean to eliminate a threat posed by a specific individual or a specific limited group, targeted for having contracted or having been exposed directly to a contagious disease by isolating and combining the specific individuals so as to remove them from all interaction with the rest of society for a period of time. Right, that's a quarantine. That's not what happened here. No one was isolated in that way. No one was told they couldn't leave their town or their homes or, in a lot of places, their work. They weren't, they were told in this case that they couldn't go skiing for the last few weeks of the ski season. Does that go back to Judge Kelly's question about whether we look to the text of the stay-at-home orders or whether we look to what was alleged in the complaint? Well, it's a question of law. So I think you look at the what's, what was the, how you would, how the court would interpret the term quarantine in the context of the policy. Right, and so the plaintiffs, so the ordinary meaning of that term in the context of the policy is individualized, as we've argued and as the courts have found. If you expand that analysis and look then at what plaintiffs allege cause the quote-unquote quarantine, you will find that none of those orders are individualized. They are general. And they do not require isolation in any way. In fact, I think most compelling is that they actually encourage you to go skiing. So the business was closed that did not isolate or quarantine these people. Are you, and I don't mean to belabor this point, but are you suggesting that those orders are embraced by the pleadings? They are. Because they, because they, because they recited that somehow that, that's sort of incorporated into the pleading when you're giving us the details of those? Because as I understand it, the plaintiffs have just said we were quarantined by a stay-at-home order. I'm overgeneralizing. And you've given us very specifics, but are you saying those can be referred to even at the motion to dismiss because it's a specific reference to a document? So you're challenging me a little bit here, Your Honor. But my answer is yes, and I think for two reasons. I do know that the complaint does reference the stay-at-home orders as a reason why the skiers could not ski. I also know that at the motion to dismiss, I believe, this is why I'm saying I'm being challenged, I believe that Arch asked the court to take judicial notice of the stay-at-home orders because they are government records that were posted online that we were able to provide to the court. And so those references were in our motion, and they're also in our brief to this court. So I do believe they can be considered for these purposes. Unless there are any other questions, Your Honors, I'll submit and simply request that this court affirm Judge Wines' dismissal of this case. Thank you, Mr. Swinho. Thank you. May it please the Court, let me first just say that the technical meaning of terms, which is what Arch has now admitted they're relying upon, the CDC definition of quarantine,    under the definition of quarantine. It's not how we interpret things under the definition of quarantine. The farmland case that we cite in our brief from the Missouri Supreme Court specifically says unless it's clear from the text of the policy that a technical meaning is intended, we use an ordinary meaning. We cite in our brief, they want to say that isolate is a condition of a quarantine. We cite in our brief multiple dictionary definitions. One says, this is just from the American Heritage College Dictionary, enforced isolation or restriction of free movement. So it's very clear that under the ordinary meaning, someone could have gone to, if they had purchased this policy, looked in the dictionary and said a quarantine is if I'm restricted from using my ski pass to prevent the spread of a disease, which is what occurred here. We alleged in the complaint in paragraph 31 that the, for example, we said the policyholders could not travel to or use their resorts. They could not stay at home or at their places of residence to protect public health against COVID-19. Plaintiffs and all policyholders were quarantined. That's allegations in our complaint, paragraphs 31 and 32 on page 81 of the joint appendix. Based on that alone, we should prevail. But even if you're going to go look at the order, underlying orders, none of them said people could go to ski resorts. You're going to a crowded ski resort with multiple other people. And at minimum, that's a fact question upon which we should have a record before we make a dispositive decision. With respect to the concurrent cause issue, you know, the, the Carriage Club case from the Missouri Court of Appeals I think indicates that, that just because there was an earlier cause like COVID-19 that then resulted in the quarantines, that then resulted in the inability to use the e-pass, we don't go back to the root cause. There's always a root cause. In that case, there was a, there was a rainstorm that caused a flood that caused earth movement. Flood was covered under the policy. May I finish my point, Judge? Yes. Flood was covered under the policy, but earth movement was excluded. And the court said that because flood was covered, the concurrent proximate cause doctrine controlled. If there are no further questions, thanks to the court for your time. Thank you, Mr. Walters. Court, thanks both counsel for your presence before us this morning, the arguments you've provided in supplementation to the briefing, and we'll take the case under advisement. Counsel might be excused.